UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ROBERT EARL DAVIS,<br><br>    Defendant. | Case No. 23-cr-00231-AMO-1<br><br>**ORDER GRANTING SECOND MOTION TO SUPPRESS** |

Before the Court is Defendant Robert Earl Davis's second motion to suppress. The Court held a hearing on the motion on October 30, 2024. Having carefully reviewed the parties' papers, the relevant legal authority, and the arguments advanced by counsel during the hearing on the matter, the Court **GRANTS** the motion for the reasons set forth below.[1]

I. **BACKGROUND**

By second superseding indictment, Davis is charged with dealing firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A), possession and shipment of firearms by a felon in violation of 18 U.S.C. § 922(g)(1), and two counts of possession of a firearm and ammunition by a felon in violation of 18 U.S.C. § 922(g)(1). ECF 89 at 4-5.

Davis moves to suppress evidence obtained from a search conducted on June 9, 2024. ECF 59 ("Mot.") at 5. Early that morning, deputies from the San Mateo County Sheriff's Office received a complaint about a loud party taking place at an Airbnb property in unincorporated

---

[1] Because the record presents no disputed issue of fact necessary to the disposition of this motion, the Court **DENIES** Davis's request for an evidentiary hearing. *See United States v. McTiernan*, 695 F.3d 882, 891 (9th Cir. 2012) ("An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist.") (internal quotations and citation omitted).

Montara.[2] ECF 104-1 ("Incident Report") at 4. The complaining parties reported that the house had been rented for one night to four people, that there were dozens of guests, and that there was drug and alcohol use occurring, in violation of the rental agreement for the property. *Id.*

A silver Nissan Maxima was parked nearby. ECF 104-2 ("Investigation Report") at 3. "[T]he vehicle was still outstanding out of the Oakland Police Department" and "was a felony vehicle with a [California Vehicle Code §] 14602.7[3] court order to impound the vehicle for 30 days." Investigation Report at 3. The vehicle had been used to evade law enforcement in Oakland. ECF 105-1 ("Dispatch Record") at 10. It was registered to Davis. Investigation Report at 3.

At approximately 12:34 a.m., Davis and his brother were leaving the party and approaching the Nissan. *Id.* at 4. Davis's brother had keys in his hand, and he reached for the driver side door. *Id.* Deputies announced their presence and gave both men commands to stop. ECF 104-3 ("Sergeant Currie Body Worn Camera Video") at 00:34:44. As Davis moved his hands towards his pockets,[4] Sergeant Currie instructed Davis to keep his hands up. *Id.* Deputy Kuhl told Davis's brother that the Nissan, which Davis's brother claimed was his, had been used

---

[2] Sergeant Currie describes this area of Montara as "secluded" and "dark." ECF 105-1 ("Currie Decl.") ¶ 4; *see also* Incident Report at 5. "[R]adio signal is poor, and cell phone service can be spotty," posing "additional safety concerns." Currie Decl. ¶ 4.

[3] That code section provides, in part:

> A magistrate presented with the affidavit of a peace officer establishing reasonable cause to believe that a vehicle, described by vehicle type and license number, was an instrumentality used in the peace officer's presence in violation of Section 2800.1, 2800.2, 2800.3, or 23103, shall issue a warrant or order authorizing any peace officer to immediately seize and cause the removal of the vehicle. The warrant or court order may be entered into a computerized database. A vehicle so impounded may be impounded for a period not to exceed 30 days.

Cal. Veh. Code § 14602.7.

[4] Sergeant Currie declares that he "observed Davis reach several times toward the front waistband area or pocket of his hooded sweatshirt[,] giving [him] officer safety concerns." Currie Decl. ¶ 6.

2

1    in a crime. *Id.* at 00:35:09.  While his brother was being handcuffed, Davis was repeatedly told to
2    get on his knees. *Id.* at 00:35:15.  He eventually kneeled, stating that he had not done anything.
3    *Id.* at 00:35:29.  As Sergeant Currie handcuffed him, Davis asked whether he was being detained
4    or arrested. *Id.*  Sergeant Currie told Davis that he was being detained. *Id.* at 00:35:29.  Davis
5    repeatedly asked why he was being detained and declared that the deputies could not search him.
6    *Id.* at 00:35:56.  Sergeant Currie told Davis that he was going to pat him down for weapons. *Id.* at
7    00:36.  Davis said "ok," and the Sergeant commenced a pat down. *Id.*  When asked whether he
8    had any weapons, Davis said that he did not have anything on him. *Id.*  During the pat down,
9    Sergeant Currie felt something in the front of Davis's pants. *Id.* at 00:36:04.  Davis said, "That's
10   not a weapon.  That's a wallet."[5] *Id.* at 00:35:31.  As Davis asked why he was in handcuffs,
11   Sergeant Currie stopped the pat down to see Deputy Kuhl and another deputy removing a second
12   firearm from Davis's brother's right hip.[6] *Id.* at 00:36:47.  Sergeant Currie then patted down
13   Davis again. *Id.* at 00:37:00.  Davis protested, saying "You're still checking me?" *Id.* at 00:37:07.
14   The Sergeant responded, "Well, your buddy has a gun." *Id.*  Davis told Sergeant Currie that had
15   nothing to do with him. *Id.*
16        As Deputy Kuhl explained to Davis's brother that the Nissan was used in a crime in
17   Oakland and asked him for identification, Sergeant Currie again ceased his pat down of Davis and
18   asked him the same question. *Id.* at 00:37:46.  Davis first said that he did not have identification,
19   then said that he did, but that the Sergeant could not go in his pockets. *Id.* at 00:38.  Davis said
20   that he would give his name and "that's it." *Id.*  Davis asked if he could sit, and Sergeant Currie
21   steered him towards the Nissan's front driver side fender, saying, "You can sit right there." *Id.* at
22   00:38.  As Sergeant Currie tried to direct Davis to turn around to face him, Davis responded that
23   he did not want to turn around. *Id.* at 00:38:12.  He remained standing facing the vehicle, with his

---

[5] In his declaration, Sergeant Currie states that "[a]lthough he was not certain what the item was, and despite Davis repeating this was only a wallet, it was clear based on its feel that it was not a wallet." Currie Decl. ¶ 7.  Sergeant Currie elected not to escalate the situation at the time, but he "had not yet concluded that Davis did not possess weapons." *Id.* ¶ 8.

[6] Neither Sergeant Currie's declaration nor the video depict when the deputies recovered the first firearm.

3

back turned to Sergeant Currie.[7] *Id.* Sergeant Currie said, "You've been drinking." *Id.* at 00:38:16. Davis responded to the Sergeant's requests for his full name, date of birth, age, and hometown. *Id.* at 00:38:40. As deputies ran a record check based on that information, Davis volunteered that he had a non-extraditable warrant out of Las Vegas. *Id.* at 00:39:35.

While waiting for the results of the record check, Sergeant Currie asked Davis to turn around, Davis asked why, and Sergeant Currie responded, "I want to see your eyes, bro." *Id.* at 00:41:29. Sergeant Currie shined a flashlight in Davis's eyes. *Id.* at 00:41:31. Davis said, "Nothing, bro. Nothing. I don't smoke weed. Nothing." *Id.* Sergeant Currie's flashlight then shifted to the vehicle, illuminating various parts of its exterior and interior. *Id.* at 00:42.

In response to an inaudible communication from dispatch, Sergeant Currie responded, "Affirm." *Id.* at 00:42:24. Davis said, "I told you. I do not have an open warrant. I know that. I haven't did [*sic*] anything wrong." *Id.* at 00:42:34. Davis then said that he'd like to be out of the handcuffs. *Id.* at 00:42:40. Sergeant Currie responded, "I get you. I hear ya." *Id.* at 00:42:45. Sergeant Currie asked Davis to close his eyes. *Id.* Davis complied. *Id.* Then, Sergeant Currie asked, "How much dope do you have on you?" *Id.* at 00:42:57. Davis said, "I don't have any dope." *Id.* at 00:43. Sergeant Currie repeated his question; Davis repeated his answer. *Id.* at 00:43:01. Sergeant Currie then asked Davis what he had in his pocket. *Id.* at 00:43:07. Davis told Sergeant Currie that he could not go in his pockets. *Id.* Sergeant Currie said, "I know. What do you have there?" *Id.* Davis said it was a wallet. *Id.* Sergeant Currie challenged that, saying, "That's not a wallet." *Id.* Sergeant Currie then questioned Davis why he did not provide his identification when asked, given that it should be in his wallet. *Id.* Davis explained that he provided his name because he wanted "to be done with this," adding that he was not under arrest, that he knew his rights, and that deputies were violating those rights. *Id.* at 00:43:22. Sergeant Currie said, "We just want to confirm who you are." *Id.* at 00:43:31. Davis repeated his full name

---

[7] Sergeant Currie's declaration states that Davis "frequently looked down toward his crotch area – the same area where [he] had felt something that [Davis] immediately claimed was a wallet. [He] also observed that Davis pulled his front area away from [his] direction at that time and later stood with his crotch pressed against the front hood of the Nissan." *Id.* ¶ 10. The video does not corroborate these characterizations of Davis's conduct.

4

and his date of birth, adding that deputies could confirm those details on their system, which would also return pictures of him that were on file. *Id.* at 00:43:35.

Sergeant Currie walked towards Deputy Kuhl, disabling the audio on his body cam while the two of them spoke.[8] *Id.* at 00:44:03. About thirty seconds later, Sergeant Currie moved back near the Nissan, this time walking around the vehicle as he illuminated different areas of its interior with a flashlight. *Id.* at 00:44:45. Sergeant Currie then re-enabled the audio on his body cam. *Id.* at 00:45:25. Davis asked for a lieutenant. *Id.* at 00:45:33. Sergeant Currie said, "You're very talkative. I'm a little concerned that you're under the influence. When's the last time you were at a doctor or a dentist?" *Id.* at 00:45:43. Davis said, "I'm about to just be quiet. Am I still being detained?" *Id.* at 00:45:52. Sergeant Currie responded, "Yes, you are." *Id.* Davis asked for his lawyer. *Id.* 00:45:59. Sergeant Currie responded, "Well, you're not under arrest, so that doesn't matter. It means [*sic*] when you're in custody." *Id.* at 00:45:59. Davis then invoked the Fifth Amendment right to remain silent. *Id.* at 00:46:04. Sergeant Currie responded, "Well, I'm trying to conduct an 11550[9] investigation." *Id.* Sergeant Currie added, "I can smell the odor of

---

[8] In the declaration filed in support of the government's opposition to Davis's motion to suppress, Sergeant Currie states that he and Deputy Kuhl discussed "(1) the need to run checks through County Communications to determine (among other things) if [Davis's brother] was a felon in possession of a firearm and the registered owner of the pistols found on [his person], and [Sergeant Currie's] observations of Davis's demeanor and [his] inability to conduct a satisfactory frisk of his person." Currie Decl. ¶ 11.

[9] That provision provides, in part:

> A person shall not use, or be under the influence of any controlled substance that is (1) specified in subdivision (b), (c), or (e), or paragraph (1) of subdivision (f) of Section 11054, specified in paragraph (14), (15), (21), (22), or (23) of subdivision (d) of Section 11054, specified in subdivision (b) or (c) of Section 11055, or specified in paragraph (1) or (2) of subdivision (d) or in paragraph (3) of subdivision (e) of Section 11055, or (2) a narcotic drug classified in Schedule III, IV, or V, except when administered by or under the direction of a person licensed by the state to dispense, prescribe, or administer controlled substances.

Cal. Health & Safety Code § 11550(a).

alcohol on your breath. You're very talkative. You seem to be very animated."[10] *Id.* at 00:46:02. Sergeant Currie asked Davis whether he was going to cooperate with the investigation. *Id.* at 00:46:29. Davis said, "No, sir." *Id.* Sergeant Currie said, "He's 1050[,]" and proceeded to arrest Davis for impeding his investigation in violation of California Penal Code § 148(a)(1).[11] *Id.* Once arrested, Davis objected to a search incident to arrest, insisting that the deputies on scene call a lieutenant. *Id.* at 00:48:15. Sergeant Currie proceeded to search Davis's person, at which point Deputy Kuhl said, "He's got something. He's got a gun." *Id.* at 00:48:27. The search incident to arrest, which included lowering Davis's pants, uncovered a loaded Glock pistol, with one round in the chamber and an additional 12 rounds in the magazine, a substance that "tested presumptively positive for cocaine," and a "toot straw[.]" Currie Decl. ¶¶ 12-13.

Davis now moves to exclude those items from evidence, arguing that they were obtained in violation of the Fourth Amendment. ECF 103 ("Mot.").

## II.     DISCUSSION

Because the search was incident to Davis's arrest, the Court first addresses whether the initial detention culminating in that arrest was unconstitutionally prolonged such that the arrest,

---

[10] The video does not corroborate the animation Sergeant Currie mentioned, nor the agitation and fidgeting described in his declaration.

[11] That statute provides:

> Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

Cal. Penal Code § 148(a)(1). In his declaration, Sergeant Currie explains he announced that Davis was under arrest after his "refus[al] to provide narcotics use preliminary questions and his continuous refusal to properly allow a pat down search for weapons." Currie Decl. ¶ 12. The video clearly shows that Davis invoked his right to a lawyer and to remain silent and does not capture any refusal by Davis to allow any of the pat downs Sergeant Currie conducted.

and the subsequent search incident to that arrest, were unlawful. Thereafter, it examines whether any exceptions to the exclusionary rule save the fruits of that search from suppression.

### A.  The Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When determining whether someone's Fourth Amendment rights have been violated, "the ultimate touchstone . . . is 'reasonableness.' " *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted). Even an initial seizure based on probable cause "can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citation omitted). "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). Specifically, whether a seizure for a traffic violation[12] justifies a police officer's investigation of that violation, and the duration of an officer's inquiries "is determined by the seizure's 'mission'– to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* at 354 (citations omitted).

Davis does not contest the legality of the initial stop and pat down. *See* Mot. at 13. Rightly so. The initial stop and pat down were constitutionally permissible in light of the impound warrant on the Nissan. Indeed, in the Incident Report, Sergeant Currie clearly articulates the reasonable suspicion supporting this limited intrusion, stating:

> Based on the totality of circumstances, we believed anyone associated to the vehicle should not enter th[e] vehicle so as to avoid any danger of additional evading crimes, and there was reasonable suspicion to make contact with anyone inside, or associated to, this vehicle in order to explain the circumstances of the court order, if needed.

Incident Report at 5. Accordingly, law enforcement was justified in confirming Davis's identity and his ownership of the Nissan, acting on the impound warrant, and conducting a pat down of

---

[12] While a traffic violation is not at issue here, the parties agree that *Rodriguez*, though not exactly on all fours, lays out the relevant legal principles. The Court agrees.

Davis's person while he was detained so that the deputies could conduct this limited investigation. *See United States v. Gorman*, 859 F.3d 706, 715 (9th Cir. 2017) (explaining that a traffic stop "should have taken only a short time – enough time to warn [the defendant] about left lane rules, determine whether to issue a traffic citation, and perform routine checks on his driver's license and registration."). Beyond that, the Fourth Amendment tolerates no further intrusion upon Davis's person. *See Rodriguez*, 575 U.S. at 354 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed.") (citation omitted); *see also Gorman*, 859 F.3d at 715 ("Police simply may not perform unrelated investigations that prolong a stop unless they have independent reasonable suspicion justifying [the] prolongation.") (internal quotations and citations omitted; modification in original).

The government's attempt to characterize the situation as an evolving one misses the mark. To the extent the situation did evolve, it was due to Sergeant Currie unlawfully prolonging what should have been a brief detention so that deputies could impound the vehicle. Otherwise, law enforcement would be free to extend any detention long enough for probable cause to materialize for some offense, even if wholly unrelated to the offense justifying the initial intrusion.

This incident illustrates the danger in permitting law enforcement to take that approach. After the initial detention and pat down, Sergeant Currie availed himself of every opportunity to manufacture some reason to illegally prolong Davis's detention. After the initial pat down, even though Davis was not the one approaching the Nissan's driver side door, Sergeant Currie accused Davis of drinking.[13] Then, Sergeant Currie accused Davis of having dope on him after Davis complied with his command to close his eyes. Sergeant Currie then consulted with Deputy Kuhl. Assuming, without deciding, that Sergeant Currie disabled his audio during that conversation consistent with county policy, the effect of that conversation is clear on this record. Once he consulted with his colleague, Sergeant Currie's mission was to continue to prolong Davis's detention until probable cause for some offense materialized. He walked back from his conversation with Deputy Kuhl peering into the vehicle, presumably for any sign of contraband.

---

[13] During oral argument, the government conceded that the statute Sergeant Currie mentioned at the scene – California Health and Safety Code § 11550 – has nothing to do with alcohol.

1  He then, for the first time, expressed that Davis was being "talkative" and "animated." And once
2  Davis asked for his lawyer and invoked his Fifth Amendment right to remain silent, Sergeant
3  Currie used that as a basis to arrest Davis, claiming that his refusal to answer drug-related
4  questions interfered with an investigation into unlawful drug use – something wholly unrelated to
5  the impound warrant about which Sergeant Currie had not asked Davis a single question.[14]

6  These actions by Sergeant Currie unreasonably prolonged Davis's detention in violation of
7  the Fourth Amendment. *Rodriguez*, 575 U.S. at 350 ("[A] police stop exceeding the time needed
8  to handle the matter for which the stop was made violates the Constitution's shield against
9  unreasonable seizures."). The unlawful arrest, and the search incident to arrest, which led to the
10 discovery of the gun, suspected cocaine, and toot straw thus "followed directly in an unbroken
11 causal chain of events from that constitutional violation. As a result, the seized [evidence] is the
12 'fruit of the poisonous tree' " and is inadmissible under the exclusionary rule. *See Gorman*, 859
13 F.3d at 714. The Court now turns to whether the government may nonetheless rely on the
14 unlawfully obtained evidence under any exception to the exclusionary rule.

15 **B.  Exceptions to Exclusion**

16 Evidence obtained in violation of the Fourth Amendment, "is ordinarily 'tainted' by the
17 prior 'illegality' and thus inadmissible, subject to a few recognized exceptions." *Id.* at 716 (citing
18 *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007)). There are three recognized
19 exceptions which allow the admission of evidence derived from official misconduct: "the

---

[14] Just as the Court rejects Currie's purported justifications for prolonging Davis's detention, the Court likewise rejects the government's argument that once Deputy Kuhl "could clearly see the outline of a gun in Davis's pants," he had probable cause to arrest Davis for carrying a concealed firearm in violation of California Penal Code § 25400(a)(2). *See* ECF 105 ("Opp.") at 17-18. By then, Sergeant Currie had already commenced his unlawful arrest of Davis based on a pretextual violation of California Penal Code § 148(a)(1). Moreover, by Sergeant Currie's own description, the firearm was "[i]nside [Davis's] pants," *see* Currie Decl. ¶ 13, and thus not, as the government claims, in plain view. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (explaining that "[t]he rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment – or at least no search independent of the initial intrusion that gave the officers their vantage point.") (citations omitted).

9

1 'independent source' exception, the 'inevitable discovery' exception, and the 'attenuated basis'
2 exception." *Id.* at 718 (citing *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir.
3 1989)).
4       The government relies on two of these – the attenuated basis exception and inevitable
5 discovery exception – to salvage the admissibility of the evidence uncovered during the illegal
6 search. Opp. at 19-21. Neither applies.
7       "Under the 'attenuation doctrine,' evidence is admissible when 'the connection between
8 the illegality and the challenged evidence' has become so attenuated 'as to dissipate the taint
9 caused by the illegality.' " *Gorman*, 859 F.3d at 718 (quoting *Ramirez-Sandoval*, 872 F.2d at
10 1396). To determine whether the exception applies, courts must analyze three factors: (1) "the
11 'temporal proximity' between the unconstitutional conduct and the discovery of evidence,"
12 (2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the official
13 misconduct." *United States v. Garcia*, 974 F.3d 1071, 1076 (9th Cir. 2020) (citing *Utah v. Streiff*,
14 579 U.S. 232, 239 (2016)). "This is a fact-intensive inquiry that turns on the circumstances of a
15 given case." *Id.* (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).
16       Conceding that the first factor weighs in favor of suppression, the government argues that
17 the other two do not. *See* Opp. at 19. It contends that Deputy Kuhl's "discovery of the firearm in
18 plain view as an 'intervening circumstance' " and that "the officers acted in good faith." *See id.*
19 The Court disagrees. Deputy Kuhl's purported discovery of the firearm "in plain view"
20 necessarily flowed from Sergeant Currie's unlawful arrest for a pretextual violation of Section
21 148(a)(1). Sergeant Currie did not release Davis after an investigation into the impound warrant.
22 Instead, he prolonged the initial detention long enough to orchestrate an arrest, and it was only in
23 effecting that unlawful arrest that Davis's body was positioned in a manner that provided Deputy
24 Kuhl an opportunity to observe a bulge in Davis's pants. *See Gorman*, 859 F.3d at 718 (finding
25 that a subsequent stop and dog sniff by a second officer, who was alerted to the suspect by another
26 officer who had impermissibly prolonged an earlier traffic stop, was not an intervening
27 circumstance but a direct result of the earlier unconstitutional seizure). Attempting to cloak the
28 unlawful prolongation of Davis's detention in the guise of a violation of Section 148(a)(1) also

militates against the finding of good faith the government urges here. Indeed, it cuts the other way: "the officer's impermissible gamesmanship is precisely what the Constitution proscribes." *Id.* at 719. For these reasons, the Court finds that the attenuation exception does not apply.

The government's reliance on the inevitable discovery doctrine fares no better. The doctrine is an exception to the exclusionary rule that "permits the government to rely on evidence that would have ultimately been discovered absent a constitutional violation." *United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009) (citing *Nix v. Williams*, 467 U.S. 431, 443 (1984)). For it to apply, "the government must show, by a preponderance of the evidence, that the information would have been discovered inevitably by lawful means, rendering the deterrence rationale for the exclusionary rule with so little basis that exclusion would serve virtually no function." *United States v. Maffei*, 417 F. Supp. 3d 1212, 1231 (N.D. Cal. 2019), *aff'd*, 827 F. App'x 760 (9th Cir. 2020). The exception "does not apply where . . . the evidence is not separately discovered through an independent source but is instead found *only* as a direct result of an earlier constitutional violation." *United States v. Garcia*, 974 F.3d 1071, 1080 (9th Cir. 2020) (internal quotations and citation omitted; emphasis in original).

Despite the government's contention to the contrary, the gun was discovered because of the earlier violation of Davis's constitutional rights. It was only as a result of Sergeant Currie carrying out an unlawful arrest that Deputy Kuhl saw a bulge in Davis's pants and Davis was further searched. The government posits that "had Davis been permitted to walk away at any time following his initial detention, it is more likely than not that Sergeant Currie or one of the several deputies on scene (all of whom were carrying flashlights) would inevitably have observed the gun in his pants." Opp. at 20. This conjecture is not evidence, and it does not satisfy the government's burden of proving, by a preponderance, that "the information would have been discovered inevitably by lawful means, rendering the deterrence rationale for the exclusionary rule with so little basis that exclusion would serve virtually no function." *See Maffei*, 417 F. Supp. 3d at 1231; *see also United States v. Holmes*, --- F.4th ----, ----, 2024 WL 4759172 (9th Cir. Nov. 13, 2024) (explaining that "[i]nevitability is the key[]" and that "[t]here can be 'no speculative elements' in showing that law enforcement would have obtained the evidence lawfully absent its unlawful

1  actions.") (citations omitted). For these reasons, the inevitable discovery exception does not save
2  the fruits of the illegal search from exclusion.
3        Finally, the government offers one generalized argument, untethered to any of the
4  recognized exceptions to the exclusionary rule noted above: it contends that law enforcement did
5  not engage in conduct that warrants the harsh remedy of exclusion. *See* Opp. at 20-21. This
6  argument fails for two reasons. First, it ignores the evidence in the record, which, as discussed
7  above, demonstrates the illegality of the search that uncovered the evidence rightly subject to
8  exclusion. Second, it invites the Court to excuse constitutional violations so long as they result in
9  the discovery of contraband. As the government puts it, "the ultimate facts of this case – that
10 Davis had concealed a semiautomatic pistol with a high-capacity magazine in his pants – indicate
11 why the deputies' decision not to release Davis was a reasonable step to ensure the deputies'
12 safety as they continued their expanding investigation . . . ." Opp. at 15-16. That turns the Fourth
13 Amendment on its head:

> [A]lthough the flagrancy of the government's conduct is relevant to the attenuation doctrine . . . , lack of flagrancy is not a freestanding basis for avoiding the application of the exclusionary rule – at least not where, as here, it falls short of establishing that the officer had an objectively reasonable good-faith belief in the lawfulness of his conduct . . . . Second, while it is true that applying the exclusionary rule in this case will mean that a guilty defendant goes free, that is true of applying the exclusionary rule in essentially every case. Nothing about this case calls for a remedy other than the typical remedy for a Fourth Amendment violation, which is the exclusion of evidence discovered as a result of that violation from criminal proceedings against the defendant.

21 *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020) (internal quotations, citations, and
22 modifications omitted).
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

## IV. CONCLUSION

Having found that Davis's initial detention was unconstitutionally prolonged such that the arrest, and the search incident to that arrest, violated the Fourth Amendment, and that no exception to the rule of exclusion applies to the fruits of that illegal search, the Court **GRANTS** Davis's second motion to suppress for the reasons set forth above.

**IT IS SO ORDERED.**

Dated: November 14, 2024

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**